[PHILADELPHIA, MARCH 27, 1829.]

Case of BONSALL'S Appeal.

Where, under the circumstances, it was manifestly for the benefit of the ward, at the time, to convert his personal into real estate, and even to expend money in the improvement of the real estate, a guardian was held to be justifiable in so doing, although subsequent and unexpected events rendered the measure injurious to the ward.

APPEAL from the decree of the Orphans' Court of the city and county of *Philadelphia,* on the exceptions filed to the report of the auditor on the account of *John Bonsall,* guardian of *Hannah Hughes.*

The auditor having reported a balance of one thousand five hundred and thirty-seven dollars and thirty and a half cents *against* the guardian, he filed the following exceptions to the report:

*Exception 1st.*—That the auditor has charged the said guardian with the sum of five hundred and ninety dollars and ninety cents, (less one hundred and ninety-six dollars and ninety-seven cents, set apart as the proportion of dower, payable to the widow of *Thomas Hughes,*) as the amount of monies payable to the ward the 10th of *May,* 1819, by *James Hutchinson* and *Edward B. Hughes,* as her proportion of the purchase money of a farm, in *Exeter, Berks* county, in which she was interested; in lieu of which amount, he accepted an interest in the land of one third of one thousand seven hundred and seventy-two dollars and seventy-two cents. Whereas, if the guardian be at all chargeable with the purchase money of the said farm, the liability cannot exceed three hundred and ninety-three dollars and ninety-three cents, (less one hundred and ninety-six dollars and ninety-seven cents,) the interest of the ward being one third of one third, and not one third of one half, as was supposed and reported by the auditor, making a difference of one hundred and ninety-six dollars and ninety-seven cents.

*Exception 2nd.*—That the auditor has erred in charging the said guardian with the interest of the said ward in the purchase money of the said farm, the same having been purchased by the said guardian and the children of *Thomas Hughes,* who were of age; (to wit, the said *James Hutchinson* and wife and *Edward B. Hughes,*)

(Case of Bonsall's Appeal.)

to prevent a sacrifice and loss, and the same having always been held in good faith, as the property of the said ward and the other children of the said *Thomas Hughes*, making an erroneous charge of three hundred and ninety-three dollars and ninety-three cents.

*Exception 3d.*—That the auditor has erred in omitting to credit the said guardian with several sums of money, by him disbursed in erecting a stone dwelling-house on the estate in *Exeter*, purchased as aforesaid, and belonging in part to the said ward, and amounting together to two hundred and seventeen dollars and ninety-six cents.

The facts upon which these exceptions were founded are fully stated in the following—

*Decree of the Court.*—"The exceptions of the guardian to the report of the auditor, in this case, who has reported a balance, as due the ward, of one thousand five hundred and thirty-seven dollars and thirty and a-half cents, will be better understood by referring to the leading facts connected with the objected items of *debit*. The accountant was guardian of *Samuel, Thomas,* and *Hannah Hughes*, minor children of *Thomas Hughes*, deceased. *Thomas Hughes* died intestate, leaving five children, to wit: *Edward B. Hughes* and *Jane Hutchinson*, wife of *James Hutchinson*, and the three wards of the accountant. Among other estate, the decedent was the owner of a farm in *Berks* county. This farm was, upon the application of *Samuel Lightfoot* and *John Evans*, his administrators, ordered to be sold by the Orphans' Court of *Berks* county, and was purchased by *Edward B. Hughes* and *John Hutchinson*, for three thousand five hundred and forty-five dollars and forty cents, being at the rate of forty-eight dollars per acre. On the first of *April*, 1810, a deed was executed, by the administrators, to *Hughes* and *Hutchinson*. On the 26th of *May*, 1819, *Hughes*, and *Hutchinson* and wife, conveyed one moiety of this farm, to *John Bonsall*, for the consideration of one thousand seven hundred and seventy-two dollars and seventy-two cents. The deed to *Bonsall* is absolute on the face of it; no trust of any kind appearing in it. The evidence in the cause, however, shows that the farm had been twice exposed to sale by the administrators; once when ninety-nine dollars per acre were bid for it, which they refused to accept; and, a second time, when it was purchased by *Hughes* and *Hutchinson*. At the time of the purchase, an understanding, they say, existed between them and the administrators, that *John Bonsall*, the guardian of the other children, should have the opportunity of uniting in the purchase, which was considered advantageous. A proposal to that effect was made to Mr. *Bonsall*, who acceded to it, and the deed for the moiety already alluded to, was executed to him. No money was actually paid, by the guardian, upon this purchase; his part of the purchase money being satisfied by receipts to the administrators, on account of his wards,—the administrators'

having originally received from *Hughes* and *Hutchinson,* a mortgage for the purchase money. No sufficient dwelling-house being upon the premises, *Hughes, Hutchinson,* and the guardian, united in erecting one, at a joint expense of one thousand two hundred and ninety-three dollars. The guardian's half of this expense was paid out of the monies of his wards. This purchase proved a most unfortunate speculation. *Edward B. Hughes,* after residing on the farm for four years, paying no other rent than the taxes, and one outstanding dower of sixty-six dollars *per annum,* to which the property was subject, left it, finding, as he said, "he could make nothing there." He has been succeeded by a tenant, who occupies the farm at the same rate, but whether with the same prospect, does not appear. The depreciation in the value of the property, is attributed to the sickness and mortality that, after the purchase, devastated the neighbourhood. The auditor, in settling and adjusting the accounts of *John Bonsall,* as guardian of *Hannah Hughes,* has rejected his claim for a credit of her portion of this purchase, and the expenses of the improvements, and charged him with one-third of one-half the purchase money of the farm. The exceptions of the guardian complain, first, that he is not chargeable with the monies invested in the farm and improvements; secondly, that if he is so, he can only be charged with one-third of one-third of the purchase money; that being, as he alleges, all *Hannah Hughes'* interest in it, and not one-third of one-half the proportion charged by the auditor.

"The first branch of these exceptions brings up the question as to the right of a guardian to invest the personal estate of his ward, in the purchase and improvement of real property. The argument for the guardian went upon the broad ground that this was a question of *bona fides,* and, that if the court should be satisfied that the purchase was made under an honest conviction that it was for the advantage of the ward, and with the exercise of that degree of prudence which a judicious man would employ in the conduct of his own affairs, the ward must accept the land. This would indeed be the introduction of a novel and a most dangerous principle in the laws governing the important relation of guardian and ward. A principle at variance with the policy of our positive institutions, and calculated to extend a discretionary authority to guardians, which sooner or later would produce the most disastrous effects. But, whether we consider the question with reference to our peculiar system, or the general principles of law, independent of statutory enactments, the conclusion must be against the guardian. Our lawgivers have exhibited a peculiar anxiety in guarding the property of minors against the fraud or negligence of those whose duty it is "to take care of their persons and estates." By the act of assembly, which constituted this court, passed as early as 1713, guardians are authorized "to put out their minors' money to in-

(Case of Bonsall's Appeal.)

terest, upon such security as the court might allow of." If the security is taken *bona fide*, and without fraud, and should prove insufficient, the loss is the minor's. But, even with this guarded authority, it is required " that the day of payment of the money put out at interest, should not exceed twelve months from the date of the security given. This power has been extended by the act of 1824, which empowers guardians, with the approbation of this court, to invest the funds of their wards, in the stock or debt of the *United States*, the state of *Pennsylvania*, or city of *Philadelphia*, or in real securities. In the sale or mortgage of the *real estate* of a minor, for his maintenance and education, equal caution is exercised. For either purpose, the consent of this court must be first obtained; and when effected, before the guardian can execute either deed or mortgage, he must give security to the satisfaction of the court, for the faithful appropriation of the funds so obtained. The recognition of the principle contended for by the guardian in this case, would be a judicial repeal of all this system, so far as it respects investments of minors' money. The wholesome checks imposed on guardians would be destroyed, and their place badly supplied, by subjecting the conduct of the guardian to the test of good faith or otherwise. In those inquiries, in which we have no positive rules to guide us, this is indeed the proper test; but, where such rules prevail, they must furnish the rules of decision. But, upon general principles of law, such a conversion of a trust fund, is inadmissible. That a guardian out of court, cannot change the nature of the estate of his ward, by turning money into land, or *vice versa*, is a well settled rule in equity. *Rook* v. *Warth*, 1 *Vesey*, 461. *Witter* v. *Witter*, 3 . *P*. *Wms*. 100. The *Earl of Winchelsea* v. *Norcliffe*, *Vernon*, 435. *Pierson* v. *Shore*, 1 *Atk*. 480. I say *out of court*, because a court of chancery, from the plastic nature of its powers, can so mould any authority it may impart for this purpose, as to obviate all the inconveniences which might otherwise result from it. Thus, a guardian may be authorized by the Chancellor, to lay out the money of an infant, in trust for his executors and administrators, if he should die during his infancy, and after his maturity, for him and his heirs. In this way, one of the most prominent of the evils incident to such a change of the fund, is obviated. The infant after fourteen, or certainly after seventeen years of age, may bequeath it by will, or, in case of his intestacy, it still goes to his personal representatives. We possess no such power, and if we did, it has not been invoked. From the remarks already made, it will be perceived, that the doctrine would enable a guardian, by converting the personal into real estate, to deprive the infant of his right to dispose of his personal estate by will, and to alter the course of distribution in case of intestacy. No such doctrine, however, exists; and, if a guardian of his own motion, will so employ the funds of his ward, he must run the hazard of his act being subsequently recognized or rejected at the pleasure of the ward.

(Case of Bonsall's Appeal.)

The other exception is erroneous in point of fact. The interest of the three minors was one half of the land, if they had elected to take it. The deposition of *Edward B. Hughes,* the witness for the guardian, shows, that he never paid a cent of his own funds for the land, but that the administrators accepted his receipts on account of his wards, as satisfaction for his moiety. Besides, he has, in the most unequivocal manner, acknowledged, that he considered that the minor's interest in the land. On the 26th of *July,* 1826, after the report of the auditor against him, and after his exceptions were filed, he executed a deed to his three wards, for the one moiety of the farm, for the purpose, it would seem, of showing his readiness to do all he thought himself called upon. After such an admission as this, connected with the evidence in the cause, it is vain to argue that the interest of each of the minors is less than one third of one half in the land, or rather, in the purchase money. There are some exceptions filed by the ward to the report, but these have not been sustained. The report of the auditor, Mr. *Kane,* stands in all particulars confirmed, and the court finally decree, that there is due from *John Bonsall* to *Hannah Hughes,* his ward, the sum of one thousand five hundred and thirty-seven dollars and thirty and a half cents, which he is adjudged to pay the said *Hannah,* together with the costs of this proceeding."

*J. R. Ingersoll,* for the appellant, after having made a calculation and offered some arguments for the purpose of maintaining the *first exception,* contended in support of the *second exception,* that the guardian was entitled to credit for the whole sum charged against him. The evidence did not, he said, exhibit the case of a guardian converting the ward's personal estate into realty, but a transaction in the nature of a partition of the real estate of the ward's ancestor, and a refusal to change it into personalty. In *England,* for reasons peculiar to that country, it is a general rule not to permit a guardian to change the nature of the property, but it is by no means clear that this may not be done under some circumstances in *Pennsylvania.* But here nothing of the kind was attempted. The guardian, with the best motives, upon the soundest judgment, and under the most advantageous circumstances, retained the original estate of the ancestor for the benefit of his ward. It is the policy of the law to prevent the conversion of fixed and permanent realty into fleeting and precarious personalty. This can only be done under certain circumstances, and in the particular mode pointed out by statute; while it is fully decided that a guardian may accept for his ward a purpart of the real estate of the intestate, and bind his ward by a recognisance for the payment of the appraised value, to the other children. *Gelbach's Appeal,* 8 *Serg. & Rawle,* 205. The guardian is only required to give security for the personalty, and when land is turned into money, the precarious character of that species of property induces the court to require fresh security. The Orphans' Court drew incorrect inferences from the acts of assembly to which they

(Case of Bonsall's Appeal.)

referred, relative to the guardian putting out to interest the money of the ward. Those acts were not intended for the security of the ward, but of the guardian; to prevent the judiciousness of his investments from being inquired into, where they had received the previous sanction of the court. Independently of those acts, the guardian has a right to make investments according to his discretion, but is liable to have the soundness of that discretion overhauled. It would be highly disadvantageous to the ward to deny this right. The most advantageous investment is in mortgages, and the guardian is frequently obliged to purchase the property, lest it should be sacrificed. The reason why the rule that the nature of the property shall not be changed, is so rigorously enforced in *England* is, that it would alter the course of descent; but this reason does not apply in *Pennsylvania*, where the realty and personalty, generally descend in the same channel. *Rook* v. *Warth*, 1 *Ves.* 461. *The Earl of Winchelsea* v. *Norcliffe*, 1 *Vern.* 435. *Witter* v. *Witter*, 3 *P. Wms.* 100. *Reeves' Dom. Rel.* 334, 335.

*Purdon*, for the appellee.—It is well settled, that a guardian cannot change the nature of his ward's estate. He cannot purchase real estate with the ward's money, because, among other reasons, it would divert it from the course of administration, alter its descent, and take away from the ward the power of disposing of it at the age of eighteen, according to Lord Coke, or of seventeeen, according to others. *Toll. Law of Exec. Bk.* 2, *ch.* 4, *p.* 182. *Hovend. on Fraud*, 442. *Gord, Law of Deced.* 444. 2 *Atk.* 413. 19 *Ves.* 122. *Co. Litt.* 89. *b. Bing.* 77. 3 *Atk.* 709. 1 *Ves.* 303. 6 *Ves.* 6. The guardian is appointed for the care and management of the minor's estate as it descended to him from his ancestor, until the minor has discretion to assume the management of it himself. This duty negatives the right to alter the nature of the property committed to his care. In some cases such a power has been directly conferred upon the court by the legislature, but in none has it been given to the guardian. One of the principal reasons why a guardian is not permitted to alter the nature of the property; namely, that it would alter the course of descent in case of the minor's death during infancy, is applicable to *Pennsylvania* as well as to *England*, though not to the same extent. If this ward had died during her minority she would have left neither father nor mother, but brothers and sisters of the whole and half blood; and the consequence would have been, that the real estate would have gone to her brothers and sisters of the whole blood, while the whole and half blood would have taken the personal estate equally. Act of 1797, sec. 7 *Purd. Dig.* 381. In many other cases the descent of real and personal estate is provided for differently by our intestate laws. 2 *Binn.* 285. *Toll. Bk.* 3, *ch.* 6, *p.* 370. Whatever may be the value of the reasoning of Judge Reeves in favour of a change in the law, so as to invest guardians with the power of altering the nature of their wards' estates, it is a clear admission that the law is

not what he thinks it ought to be. *Reeves' Dom. Rel.* 334, 335, 337. Besides the reasons urged in support of the rule in *England,* there is one peculiar to this country, where lands are the subject of speculation, and pass from hand to hand as an article of traffic, almost as readily and frequently as some sorts of personal property. The consequences of permitting him to speculate in his own name with his ward's money, need hardly be pointed out. The property thus purchased may be treated as that of the guardian or ward, according to the successful or unsuccessful issue of the speculation.

The circumstance, that if a partition had been made in due course of law, and the guardian had accepted these lands for his ward, the ward would have been bound, is no argument in favour of the course pursued in the present instance. If such a proceeding were valid, the act of assembly would not only be useless and inoperative, but the interest of parties whom it was intended to protect, would be sacrificed. It would enable the guardian to deprive the eldest son, and the other children in their turn, of the privilege given them by the act, of taking the land at the appraisement. In partition, too, the guardian, if he accepts for his ward, is obliged to pay or secure to be paid to the other heirs, the appraised value of the land; but, by the course pursued in this case, the guardian may, at public sale, purchase them far below their value, without giving any security whatever, except such as may be required by the administrators, with whom he may make the best terms he can. The sureties in the guardian's general bond, would not be liable for the payment, because, he having no power to purchase lands, any misconduct in relation to the purchase, would not be an infraction of his duties as guardian, within the meaning of the bond. *Muir* v. *Wilson,* 1 *Hopk. Ch. R.* 512. In *Gelbach's Appeal,* 8 *Serg. & Rawle,* 205, it is expressly declared, that the guardian derives the power to accept lands for his ward, from the act of assembly exclusively. To give validity to a proceeding by which a ward is compelled to take a portion of her father's real estate, by the voluntary and irregular act of the guardian, is to dispense with all the guards with which the legislature has surrounded the ward, to defeat the rights of others, and virtually to repeal the whole system of the law of partition, by rendering a compliance with its provisions unnecessary.

Mr. *Purdon* then went into an argument and calculation, to show that the auditor was right in charging the guardian, with one third of one half, instead of one third of one third of the purchase money.

The opinion of the court was delivered by

HUSTON, J.—The facts in this case, and there was no dispute or contrariety of testimony, were as follows:—*Thomas Hughes* died, leaving nine children, six by a former wife and three by a second wife: of the six, one died after the sale hereafter mentioned, aged eight or nine years.

(Case of Bonsall's Appeal.)

On a petition by the administrators, the Orphans' Court of *Berks* county, granted an order to sell lands, to pay debts and maintain the children.  A tract of seventy-three acres had been exposed to sale, and ninety-nine dollars per acre bid for it by one *Allison.*  The administrators considering this price too low, bid higher, and returned it unsold.  Two subsequent orders were obtained, and the land offered for sale.  On the second of these in 1819, the eldest son, *Edward B. Hughes* and *James Hutchinson,* who was married to the eldest daughter, finding it likely to sell at what they supposed under its value, bid for it.  The tract was crying at forty-eight dollars per acre; the administrators refused to strike it down at this price unless they would agree to let the other heirs or some of them be interested in the purchase.  This they agreed to, and it was struck down to them and a deed made to them; and they, in pursuance of an agreement to that effect, the next day conveyed one half of it to *John Bonsall,* who was guardian of *Hannah* and two others of the children.  *Bonsall* paid no money, but made three receipts, each for one third of the purchase money of the tract, as so much received from the administrators on account of his three wards, and gave them to *E. B. Hughes* and *J. Hutchinson,* who handed them to the administrators in payment for the land.

The deed to *Bonsall* did not state the trust for his wards, but the proof was full, that the agreement and understanding at all times were, that the purchase was for their use, and the payment was as above stated.  The place required a house and other improvements: these, by agreement of *Bonsall* with *E. B. Hughes* and *Hutchinson,* were made by *E. B. Hughes,* who moved on the land, and cost, as he stated, twelve hundred and ninety-three dollars; one half of which was divided by *Bonsall* among his three wards, and one third charged to each.  The land was sold, subject, it seems, to a dower, and it has produced nothing more than this dower and the taxes since.  *Bonsall* offered to each of his wards a deed for one third when they came of age, and they refused to accept them.  On *Hannah's* coming of age, he offered to settle his accounts, and the Orphans' Court charged him with the price of the land, and of course, with the improvements, holding that he must keep the land and pay for it, and account for the money and interest.

As we had not the administration accounts, nor the state of the personal or real estate of the intestate before us, there is some difficulty in understanding how lands could be sold for debts, and the purchase money go, not to pay debts, but to children; and, if sold to support the children, it is not clear how it could be bought by the children and improved by them, and never yield them any rent, and yet they be supported.  It appears, however, from the guardian's account, there was other estate; perhaps this land was but a small part of it.

We have not considered this case as clear of difficulty.  The doctrine that a trustee cannot go beyond the line of duty prescribed by

law, and make changes of trust property from money to lands, or lands to money, is well settled; and; generally, if the trustee invests money in lands, the *cestuy que trust* may, at his option, accept of the lands or refuse them, and demand his money. *Harrison v. Harrison*, 2 *Atk*. 120.    And it is also true, that a trustee·will not be allowed for buildings and improvements, even where they are substantial; he is generally allowed only for necessary repairs. 1 *Johns. Cha.* 27.    But this is, as all other general rules must be, subject to exception, when circumstances require an exception, to prevent injustice.  Guardians are also a kind of trustees, over whom courts have held a very strict hand: perhaps this is right, and this court does· not feel disposed· to decide otherwise. ' But the duty and the power of a guardian are, in this country, peculiar in some respects.   For, when a man owning lands, dies intestate, and an application is made to the Orphans' Court for· partition or appraisement, and the inquest return that the' lands will not divide, and· value the whole together or in parcels, a guardian may, if no child takes at the appraisement, either permit the lands to be sold, and take his ward's share in money; or, he may take lands. at the appraisement, and bind his ward to' pay the share or shares of the other children: This has always been done, is contemplated by our laws, and has been sanctioned by this court. *Gelbach's Appeal*, 8 *Serg. & Rawle*, 205.    And, as to improvements, so much of the land in this state is totally unproductive, unless some means are used to bring them into cultivation or render them habitable, that guardians have, at all times, let lands on improving leases; that is, given a certain number of years to a tenant, for erecting buildings, &c.; and, where ·the minor has funds, have made buildings such as were absolutely necessary to render lands habitable and productive; and generally this has been allowed without objection. 'Our act of the 19th of *April*, 1794, about intestates, authorizes the Orphans' Court to grant orders to mortgage or sell part of the lands to pay debts and maintain and educate the children, *and improve the residue of the estate*, (see sect. 19.)    And in some parts of this state the latter clause is an important one.  I do not, however, mean to say a guardian has an authority as to improvements *ad libitum*, or beyond what is clearly necessary.

To apply these remarks to the present case.  The guardian did not expend money collected by the administrators, and paid to him, in purchasing lands; but, when a part was selling, and a portion of the purchase money would come to his wards; and when, in the opinion of those children who were of age, it was selling at a great undervalue; when the administrators, one of whom was brother-in law of the intestate, was so fully convinced of. this, that he would not agree to make a sale unless the wards of *Bonsall* were let in to partake of the advantage to be derived from a purchase at that price; and, when from all the testimony, and· all the argument, it is proved and admitted, that in making this purchase, or rather, in agreeing to

(Case of Bonsall's Appeal.)

take a share of the purchase, *Bonsall* acted, as he and as all their friends believe, for the benefit of his wards, it would seem hard to throw any loss on him.   An extraordinary combination of circumstances had raised the price of lands in this state, beyond that at which they would continue. They have since been depressed almost as much below what will settle down as their value.  The impression as to the value of lands, was not partial; it pervaded all ranks. A few cautious individuals who did not engage in buying, have since assumed credit for much wisdom.  No doubt every relation of *Hannah Hughes* thought this land was sacrificing at forty-eight dollars per acre.   The act of the guardian was no more than saying, I will keep it for my wards at that price.  If not then sold, and if appraised, he *might have* taken it at that price, and the law and the decisions of this court would have supported him.  And the taking at an appraisement, and joining in a purchase of the lands in which the ward has a share, are so much alike, that we think the guardian, in this case, on the facts proved and not denied, was justifiable.  The conduct of the administrators, their refusing to proceed with the sale, unless *Hannah Hughes* and the others were to partake in the advantages, is a strong circumstance; more so than the fact that the two who were of age wished to purchase on their own account; it shows that it was considered as giving the land of their father to these three children by means of this order of court, instead of a proceeding to divide or appraise.

Much was said at the argument, about this piece of land being taken by five or six children, instead of nine; and of the proportion which *Bonsall* ought to account for in money, if he must account at all.   We do not know what other estate there was, nor whether any of it was bought for the other three, nor why the administrators, who insisted on the children being interested in the purchase, agreed to let these five have this land; but, as we have determined that *Bonsall* is not bound to keep it, the Orphans' Court were wrong in deciding that he must pay *Hannah*, (whose case alone is before us,) her share in money: we need not discuss this part.  The Orphans' Court were right in that part of the case, which related to the proportion of *Hannah*.

As to the rents since the sale, and the buildings, from the decision of the Orphans' Court, it was immaterial for them to consider this part of the case.   If *Bonsall* must keep the lands, he must also be owner of the rents, and pay for improvements; but, from the decision of a majority of this court, these are now subjects of inquiry, and we have not before us enough on which to decide   We do not know whether proper attention and care were exhibited; we do not know whether there was an old house or no house on this land; and we have only the testimony of *Edward B. Hughes*, who built the new one, as to its being proper for this land; or, as to the propriety of its cost: some more specific evidence on these points must be had. And, contrary to the usual course in such cases, we remand

(Case of Bonsall's Appeal.)

this cause to the Orphans' Court, to inquire and decide as to the conduct of the guardian, since the purchase, as to the rents and to the buildings.

TOD, J.—Assenting, as I do, most entirely to the perfect good faith and honesty of the proceedings of this accountant, in point of law, I am not able to concur in the result which the court has come to. It strikes me, that the money of the infant has been laid out imprudently; but, whether imprudently or not, if illegally, the guardian must, I think, bear the loss himself. The authority relied on by the counsel of Mr. *Bonsall,* is the case of *Gelbach's Appeal,* 8 *Serg. & Rawle,* 205. To my apprehension, *Gelbach's* case is very unlike the present. There the land had been publicly taken for the infant in the infant's own name. In that case, the act of assembly expressly authorized the guardian to bind his ward. According to the practice, from the first settlement of the country, a whole farm was taken, for a son, at the appraisement of a jury; a son who was himself to be a farmer, who probably had no means of living except upon a farm, and who had every reasonable prospect of finding the purchase a good one. In the present case, Mr. *Bonsall,* the guardian, appears to have acted without any, the slightest pretence of authority of law. With the visionary hopes of a great bargain, he enters into a speculation, altogether in his own name, purchasing one undivided half of seventy-three acres in *Berks* county, which land had been part of the estate of the father of his wards, but which had been already sold at public sale by the administrators, under an order of sale by the Orphans' Court, for the *payment of debts and the maintenance of the minor children of the intestate.* This purchase of the half in Mr. *Bonsall's* own name, was, as it now appears, in trust for the three children, his wards, and he paid for it with their money, or what is the same thing, he gave receipts to the administrators as for so much cash, the purchase money of the half of the land being seventeen hundred and seventy-two dollars. Thus, in lieu of her money, *Hannah Hughes,* the appellee, is now presented with a title to one undivided sixth part of seventy-three acres in *Berks* county: a sort of property, which, in my opinion, no rule of law or equity will oblige her to take.

The case, if it stopped here, would, I think, be conclusive in favour of the appellee. But, so far from stopping here, Mr. *Bonsall* went on to lay out almost the whole of the residue of the money of the three infants, in building a new house on the land, the children's half of the cost of the house being six hundred and forty-six dollars and fifty cents, cash expended, not, as I understand it, by the guardian, but at least forty miles from his residence; of course not under his view, nor under the view of any body else, accountable as guardian, but by *Edward B. Hughes,* one of the partners in the purchase, who occupied the house and the farm some four or five years, paying nothing except the taxes and the interest of the widow's third.

(Case of Bonsall's Appeal.)

According to his affidavit, the farm was not such as would yield any clear profit. And there is no doubt of the correctness of his statement, because the tenant who came after him, has, for years, held and still continues to hold the farm, new house, and all, merely keeping it in repair, paying the taxes, and the interest of the widow's share; so that the speculation appears to end in this: *Hannah Hughes,* instead of her money, which, with interest, would amount to more than twelve hundred dollars, is offered a deed for one undivided sixth part of a house and farm, which, admitting what I suppose to be very doubtful, if not impossible, that the girl could attend to it herself, and be able to hold her own beset by so many partners, yet can produce during the widow's life, no clear profit to the amount of a grain of corn; and, after the widow's death, judging from all former rents, provided no accident happens, and provided no repairs of the buildings are wanted, will yield to Miss *Hughes* something less than one per cent. on the money, which, without this purchase by her guardian, would be now fairly in her hands. I believe there is no possible case which can authorize the throwing of such a bargain upon an infant.

As to the necessity imposed upon a guardian to interfere to prevent the sacrifice of an estate, I would observe, this purchase by Mr. *Bonsall,* was a month or so after the public sale by the administrators. At any rate, from the proofs in the cause, there is not the least ground to suppose that money was wanted. Actually, the sale appears to have been upon credit. But, suppose it to have been compulsory, I would still insist that a guardian cannot be permitted to expose the whole patrimony of one child to the risk of destruction, to prevent imaginary loss to an estate in which that child has but a ninth share.

There are some matters which, perhaps, the affidavits do not sufficiently explain: for instance, it might seem that Messrs. *Hughes* and *Hutchinson,* the original purchasers, had not the same faith in the profits of the bargain, which Mr. *Bonsall* appears to have had. After getting a complete title, in the very next month, they gave up one full half of their purchase to *Bonsall,* without asking any premiums. I was at first concluding that this might have been done, because, they had promised the administrators to let the rest of the children into a share of the profits. But that cannot be. There was no promise that any children should have more than their equal share, and the three wards of Mr. *Bonsall* have been loaded with one half of the whole bargain, when, if the promise was the motive, three ninths of the speculation was all that could have been allotted to them.

The policy of the law, and a due regard to the protection of infants, seem to require that good intentions shall not excuse a guardian who takes in hand to risk his ward's money without authority. But, granting such excuse may be received in some cases, the peculiar circumstances of this case are such, though they leave not

(Case of Bonsall's Appeal.)

the least stain upon the moral conduct of Mr. *Bonsall,* yet that we cannot, by any means, in my opinion, permit him to throw this heavy loss from himself by setting up a parol trust against the infants, contrary to his own recorded deed.  If we can, then it seems to me that other men, totally different from Mr. *Bonsall,* that any guardian, trustee, or executor, having in his hands the money of infants, may, in times of speculation, be permitted to lay out that money in this mode of preparation for either event, and be doubly armed with proof; first with a deed recorded, showing the title in himself, and thus exposed to the temptation, and holding the power of claiming the profits for his own use, if any profits there are, having at the same time, in reserve for the event of a loss, parol declarations of trust to be proved by men whom the executor or guardian well knows, but whom the infants may never be able to find out.  Even in the present case, where there is not the least ground of suspicion, of intended unfairness, suppose the land which had been conveyed to Mr. *Bonsall* at the price of seventeen hundred and seventy-two dollars, had been sold the next year for three thousand dollars, and *Bonsall* had died and the witnesses had died or removed from the country, or had forgotten the words spoken, or were unknown to the infants; what possible chance would they have had against the record and against the statute of frauds?  The recorded deed states, the purchase money to have been paid by Mr. *Bonsall;* it conveys the land to him and his heirs, " *to the only proper use and behoof of him, the said John Bonsall, his heirs and assigns for ever.*" Nothing was recorded, nor even written, showing the least trace of property in the infants; and not until six years afterwards, when the whole bargain had gone to perdition, does Mr. *Bonsall* make a deed throwing the legal title off of himself, upon his three wards. This is a delay, a negligence, which, if there was nothing else in the case, ought, in my opinion, to subject him to the whole loss.

. It is said by the appellant's counsel, that the Orphans' Court have, upon their own principles, erred in charging him with one third of one half of the purchase money of the seventy-three acres:  Whereas, at most, it could be but one third of one third, that being *Hannah's* share in her father's estate. · Evidently there is no such mistake.  *Hannah* had other property in the hands of her guardian, and with it he purchased for her, not one ninth part, but one sixth part, of the seventy-three acres.  If the purchase is left upon his own hands, as the Orphans' Court decided that it ought to be, he then holds one sixth part of the land intended for *Hannah,* and is liable to her for one sixth part of the purchase money.  In one word, whatever money of her's he has received, or ought to have received, he is accountable for, and must restore in money, and not in real estate.

Therefore, in my opinion, the decree of the Orphans' Court should be affirmed.