## Gochenauer *against* Froelich.

In this case will be found a statement of the duties and liabilities of trustees, in the management of the trust fund.

ERROR to the district court of *Lancaster* county.

John Froelich and wife and others, heirs at law of Christian Heistand, against Joseph Gochenauer and Abraham Hamaher.

The facts of the case are fully stated in the opinion of the court.

*Jenkins*, for plaintiff in error.
*Reigart*, for defendant in error.

The opinion of the Court was delivered by

Huston, J.—Jacob Heistand, of Lancaster county, made his will, on the following clause of which the plaintiffs below, who are defendants here, relied.

" *Item.* The rest, residue and remainder of my estate not heretofore particularly bequeathed, I order to be equally divided among my hereinafter named five children, except my son Jacob Heistand shall have one hundred pounds less than my other hereafter named four children. My daughter Barbara, married to Peter Ebb, shall have her full fifth part thereof; my daughter Elizabeth, married to Jacob Keckman, shall have her full fifth part thereof; my daughter Catherine, now married to John Wryer, shall have her fifth part thereof; to have and to hold the said residue to my said four children, their heirs and assigns forever, including my son Christian Heistand—he shall have the full fifth part thereof. It is my will, and I order that my son Christian Heistand, his heretofore bequeathed fifth part not shall have in his possession, but my hereinafter named trustees, or the survivor thereof, shall put the said fifth part at interest, and the said interest shall be paid to my said son Christian. Heistand yearly, and every year during his natural life; but if the interest should not be sufficient for his maintenance, then my hereinafter named trustees shall have a right to give him of the principal sum so much as they shall think proper, and the remainder thereof, if any remains, after his decease, shall be equally divided among his heirs."

The testator died in 1808, and the executors settled their account about 1810; and the share of Christian, at that time, was 1272 pounds, or 3393 dollars 55 cents.

In 1815 Christian married, and two weeks after the trustees, on

a settlement with him, would seem to have paid him all the interest, and about 70 pounds of the principal. About this time Christian applied to them for farther advances of the principal. They required security; and on his offering a Mr. Bare as surety, who it is admitted was sufficient, they advanced to him the whole principal remaining in their hands, 1202 pounds.

It was further shown, but the dates are not all precisely stated, that within three years after this, Christian Heistand became insolvent and assigned, under the insolvent law, to William Cooper and —— Kauffman; who, in 1819, sued these defendants, and recovered in common pleas. A writ of error was taken and the decision reversed; see the case in 8 *Serg. & Rawle* 187; this was in 1822. About a year after this, on a settlement, Christian Heistand executed a full release to the trustees, and it would seem the bond was given up, as it is found among the papers of Bare, the surety, who is dead. Christian Heistand died on the third of February, 1835.

There is on our paper book some testimony relating to Christian Heistand. The witnesses agree that he was a man of common understanding, but not of very bright intellect; but one witness says he was easy in his bargains; another that he was not easily imposed on; another says he was sometimes of sharp understanding, and other times not—he was curious. This last expression I do not understand, as applicable to this case. There was no testimony as to the causes of his insolvency, but we can not forget that between 1815 and 1819 insolvency and ruin were more common in Lancaster county than at any time before or since, and that it was not confined to those who were considered of weak understanding or who were inexperienced in business.

There was one witness who related a conversation with Gochenauer, in which he says Gochenauer told him he was surprised that Bare became bail, and that he told Bare so, who replied, " that he would not have been bail, but that Heistand was indebted to him." And it has been argued as if this had occurred at the time the money was given, whereas the words would only apply to a conversation at some subsequent period.

The verdict was for a sum which would seem to be for the whole principal and interest, from the death of Christian Heistand. I pass over all that was said about the pleadings—narr, plea and replication, because no objection was made to any of these in the court below. And since our act of assembly permitting amendment even after jury sworn—nay, compelling the court to admit it—I do not think the supreme court ought to reverse on that account; the party ought not to be allowed to go on and take his chance before a jury, and then go back to objections which he would have made at the trial, if he had not known they must at once be removed; nor do I believe it right to reverse and send a cause back, for errors in pleading which the common pleas are bound to permit to be amended. It would seem that the better course is to consider

[Gochenauer v. Froelich.]

the amendment as made, or the error as waived, by not objecting at the proper time..

Certain points were proposed to the court to which answers were requested, and to these, separately, no answers were given; but the one side insists that the general charge of the court contains an answer to the whole of them. The plaintiffs in error say this is not the case, and they further insist that the law, as stated in the whole charge, is not a correct exposition of it, as applied to this case.

The rules which govern courts in deciding on the responsibility of agents or trustees would seem to be well settled, but the cases (perhaps because the facts of each case are not all stated) would seem to create some difficulty as to the application of those rules.

It is well established that no trustee shall exercise his authority over the trust fund, so as to make the loss of the *cestui que trust* be a gain to the trustee; in such case, the courts have carried the doctrine of the responsibility of trustees out to its full extent.

It would seem, also, that where the duty to be performed, or the power to be exercised, is distinctly and precisely defined in the instrument creating the trust, the trustee ought not to go beyond his authority so distinctly defined; and if he does, he is generally held liable: but the cases on this subject are not reconcilable, at least not easily, where negative words are not introduced expressly forbidding certain things. It is not easy to say, in all cases and under all circumstances, what is within or not within the powers of trustees; the instrument is drawn with an eye to a certain state of facts, and the duty of the trustees might be obvious while such a state of facts continued; but another state of facts may entirely change that duty: for example, the interest of 3390 dollars may, with economy and management, furnish food and raiment for a single man, but it may, or must be totally inadequate to support that man, together with a family of five, six or seven children.

In the present case, it would seem, there is not even an allegation that the trustees made or attempted to make any gain to themselves; nor does it seem clear that they have shown any intention unfairly to favour Bare, the surety.

Let us look at the facts. In 1822, a question as to the duty and the power of these trustees was before this court; and as an instance of the fact that though the law, in general, as to the powers and duties of trustees, would seem to be settled, yet that the application of these rules is sometimes not very obvious, we find that all the judges did not see the matter in the same point of view. They did not agree as to the application of the law to this case. All agree that where trustees act with honest intentions and ordinary prudence, they shall not be responsible, though matters turn out unfavourably. The present chief justice thought the giving the whole sum to Christian, with security, was of itself a breach of the duty of the trustees. The late chief justice and Justice Duncan thought

[*Gochenauer* v. Froelich.]

otherwise. The late chief justice says the trustees had large discretionary powers by the will of Jacob Heistand, and it was necessary they should have them. They might have paid him any part of the principal they thought proper. And again, it is distinctly asserted that, until the principal was restored to the trustees, neither Christian nor his assignees could recover the interest. Now, without deciding which of the two opinions is most consistent with the general doctrine of this court, we must see the hardship of deciding that trustees are now answerable for acting on what was then decided to be their duty, or at least within the scope of their authority.

In 3 *Atkyns* 480, we have the opinion of a very distinguished chancellor, that the court has always treated trustees, acting with good faith, with great tenderness. A trust, it is said, is an office necessary between man and man, and which, if faithfully discharged, is attended with great trouble, and it is an act of great kindness to undertake it. To add hazard or risk to that trouble, and to subject a trustee to losses which he could not foresee, would be a manifest hardship, and would deter every man from accepting so necessary an office. This doctrine is expressly recognised by Chancellor Kent, 4 *Johns. Chan.* 628, 9, and by every chancellor and compiler. See 2 *Maddock's Chan.* 132, 4.

Generally, perhaps always, the trustee is appointed to act for the benefit of the *cestui que trust,* and because he is supposed to possess a stronger mind and more knowledge of business than the person for whom he is trustee, and where there is an express discretion allowed on certain contingencies, the trustee is not answerable, though in the exercise of such discretion loss occurs to the fund. In Gelbach's appeal, where lands, in which a minor had an interest, were appraised, and the guardian took the lands at the appraisement for his ward, the ward was bound, though before the ward became of age, the price of lands had fallen so much that the ward lost his whole estate, 8 *Serg. & Rawle* 205; and in Bonsall's case, 1 *Rawle* 273, and Bowman's appeal, 3 *Watts* 309, where lands had been appraised, and no one taking them at the appraisement were ordered to be sold; and at the sale the guardian, on reflection, and on consultation with the relations of the ward, bought a part for his ward, to prevent what he thought a loss by a sale at an undervalue, the guardian was protected from loss in this court—and we have many other cases in which a trustee, acting honestly and with good intentions, has not been held liable for losses, though greater care and caution might have prevented such losses. Christian Heistand was not an idiot, nor an intemperate person; nor, according to some of the witnesses, easily imposed on in bargains; but there must have been some disposition to extravagance, or some fear of imprudence, which induced the appointment of trustees. The authority given to those trustees was, however, very far from being strictly limited. They had a right to give him

[Gochenauer v. Froelich.]

of the principal sum so much as they thought proper. Seven years after the testator's death, he married. There is no surmise that the marriage was in any respect an imprudent one; nor is there any evidence of imprudence on his part during those seven years. The parent who doubted him in 1808, if alive, might have had no doubt in 1815. The bail, it would seem, had no doubt, for there is some reason to question the testimony of the witness who relates what he said Gochenauer told him.

If Christian had been an idiot, the question, was the interest sufficient to support him and his family? would properly arise; but he was not one. Had these trustees a right to consider themselves placed in the situation of the parent, and authorised to do as they believed the parent would do if alive in 1815, and did they act with honest intentions and use their best judgment?

The court ought not, and the jury ought to have been told that they must not judge from the result. No human prudence will save a trustee whose conduct is judged by such a rule. In the cases cited, and in fact in all cases, a trustee or guardian may lose if judged by this criterion.

It would have been more consistent with the rules on this subject, if the court had told the jury to consider whether these trustees acted with good faith and prudence—whether if Christian had been their son or nephew in 1815, and just married, and they, or one of them, was leaving him a legacy, it would have been given to him directly or put in the hands of trustees and out of his power.

When a man is married, he wants furniture for his house; if a mechanic, he wants tools and stock for his trade; if a farmer, he wants wagon, plough, &c., and horses and stock for working a farm; with these he may assist in supporting himself and family, and perhaps increase his property—without them he must be a hireling. Was it certainly improper in these trustees to give him on his marriage something more than the interest, or was it certain they did not honestly believe they were acting rightly in giving all when they gave it?

There are cases where a claimant is entitled to the whole of his demand, as much as to any part of it; and there are cases where a part may properly be allowed, and not the whole.

As to the amount paid him out of the principal before 1815, (about 70 pounds,) that would seem to have been before the court had sanctioned in the case of the assignees and these trustees, and to be out of the power of the court now, though it would seem they were now charged with this sum with the rest.

It is probable, though not certain, that on another trial, more light may be thrown on the case. The transaction is not recent, but many must be alive who knew Christian. The relations of his wife would not probably have agreed to her marriage with him if he was totally incapable of managing for himself and family. Did they think him capable? If so, might not the trustees think so?

[Gochenauer v. Froelich.]

What did the neighbours think of his understanding and capacity to conduct his affairs? I mean, what did they think before his insolvency—for it will not do to form opinions of men's capacity for business by the result of their dealings—between 1814 and 1828.

We think there was error in the view taken of the duties and powers of these trustees, and in leaving all to the jury without pointing their attention to the rules of law, as heretofore settled; and to the discretionary powers given to these trustees; and in not telling them they were to judge of their conduct by what they really thought, and had a right to think, in 1815, and not from the unfortunate result, which, perhaps, no one anticipated. Nay, insolvency in those days often resulted from acts which every one supposed prudent, or resulted from the failure of others. We can now discourse very wisely on the folly, extravagance, (and sometimes we call it infatuation,) of those times, yet that folly, and extravagance, and infatuation, had seized on people as wise as we: it pervaded all ranks.

There was little said here, and it would seem little in the court below, about the release. If the trustees had acted corruptly, or had wilfully acted against their duty, and beyond their authority, perhaps the release ought not to save them totally from the heirs. It ought not, however, to be forgotten that a construction was put on this will and on the power of the trustees; and I think it would be against all precedent to make trustees answerable where they acted agreeably to the opinion of a court, even though we should think that opinion such as we would not have given. I do not, however, say, nor is it necessary to say, whether that opinion is approved by all the members of this court; but so far as the trustees acted on that opinion, and acted honestly on what they supposed was decided, I can see no ground for holding them liable.

On the whole, we think this judgment ought to be reversed, and the cause again tried, and the doctrines of the law applied, as here stated, to the facts which may be proved.

The case in the common pleas was considered, and the opinion given without a due attention to the clause giving discretionary power to the trustees: it cannot be overlooked in deciding on this case. We are of opinion that the case was not submitted to the jury in the proper point of view, and that it should go again to the county court; but as it is probable, nay, almost certain, that additional testimony will be given, we cannot say what opinion ought to be given to the jury after such testimony.

Judgment reversed, and *venire de novo* awarded.