## Morton v. Wade, Jr., et al.

(Decided May 11, 1917.)

### Appeal from Todd Circuit Court.

Judicial Sales—Inadequacy of Price.—Inadequacy of price, alone, is not a sufficient ground for setting aside a judicial sale, unless the inadequacy is so great as to create a presumption of fraud or shock the conscience of the court, but where the inadequacy is accompanied by circumstances, which tend to cause it, or where it is attended by any apparent unfairness or impropriety or oppression on the part of those connected with the sale, it will be set aside, though the circumstances themselves, alone, would not furnish grounds for vacating the sale.

PETRIE & STANDARD for appellant.

SELDEN Y. TRIMBLE, J. R. MALLORY and TRIMBLE & BELL for appellees.

OPINION OF THE COURT BY JUDGE HURT—Affirming.

This was an action in the Todd circuit court, wherein certain creditors of the appellee, Ed Wade, Jr., whose

debts were secured by mortgage liens and execution liens upon two tracts of land owned by him, which adjoined and constituted one tract upon which he lived, secured judgments against him for their debts and the enforcement of their liens. The lands were appraised by the appellant, E. L. Morton, and J. E. Petrie, who were selected as appraisers for that purpose by the commissioner. They appraised the two tracts of land at the sum of $12,150.00. At the sale, the lands sold for $8,300.00. This sum lacked about $2,000.00 of paying the creditors, whose debts were secured by liens upon the lands. Petrie was the successful bidder, but by an arrangement between him and appellant, Morton, Morton was substituted as the purchaser of the lands and executed bond with Petrie and others as his sureties for the purchase price. The sale was reported as having been made to Morton. Wade filed exceptions to the sale and asked that it be set aside. The court sustained the exceptions and set aside the sale, to which judgment of the court, Morton excepted and prayed an appeal to this court. There were several exceptions to the sale, but as the others seem to be formal or else based upon matters which could not be raised on exceptions to the sale, it is only necessary to advert to the ground, which was the real ground of exception to the validity of the sale. The appellee, Wade, insists that the price for which the land sold was inadequate, and that the reason for its sale, at such a price, arose from circumstances of impropriety and unfairness attending the sale on the part of those connected with the sale, and of such surprise upon his part, against which ordinary prudence could not guard, and that the sale under the circumstances resulted in great injury to him. The court heard testimony upon the exceptions to the sale and which is brought before this court in the transcript of the record.

It was shown and not denied that on Thursday preceding the sale upon Monday, that Wade was trying to secure some one to purchase the land, who was able to execute the bond and who would give for it a price sufficient to practically discharge the liens upon it, and that in his efforts to do so, he secured one Yancey, who came and examined the lands and thereupon agreed with Wade, that he would attend the sale and purchase the lands at the sum of $10,000.00, and would then hold it for the benefit of himself and Wade. Yancey was financially able to make the bond and to pay the purchase price. Wade relied upon this agreement with Yancey, until the day of

the sale, when about half after eleven o'clock, on that day, he first learned that Yancey would not be able to attend the sale. Yancey was the manager of a telephone company and lived in an adjoining county, and was fully intending to carry out his agreement with Wade, but on the day of the sale, very unexpectedly to Yancey, his employers, who reside at a distance, came to visit their holdings, and required his presence at a place other than the place of the sale. Yancey undertook to inform Wade of these facts on the morning of the day of the sale and that he could not be present, but was not able to get into communication with him over the telephone, and finally sent to Wade a message informing him of the situation, that he might secure a purchaser other than himself, but Wade failed to receive the message or information in regard to it until about half after eleven o'clock. The sale was to be made about one o'clock upon that day and was made at about half after one o'clock. It seems that Petrie had knowledge of the arrangement between Wade and Yancey, and when Wade had become aware that Yancey could not fulfill the arrangement between them, Petrie made inquiry of Wade, if Yancey was going to be present, and when Wade answered that he would not, then Petrie inquired of him if one Shemwell was intending to buy the land, and received information from Wade that it did not suit Shemwell and that he would not buy it. Petrie advised Wade to make the land bring $10,000.00, and announced to him that he was intending to bid for it and inquired of Wade what he would give him to bid it in for him at the sum of $10,000.00, and Wade told him to go ahead and buy it and that he would give him $500.00 to do so. Wade and Petrie, it seems, had been conferring, before that time, about Petrie purchasing the land and holding it for the benefit of himself and Wade, and they had been discussing what things would be done upon the land in the event of such a consummation, and among them was a dairy business, for which Petrie would furnish the money and Wade would do the work. Wade observed Morton and Petrie conferring together and inquired, if Morton had a purpose to bid upon the land, and Petrie said that he had not, that he could not make the necessary bond. Wade testifies that he understood, from the statements made in their conversations that Petrie had agreed to purchase the land at $10,000.00 and to hold it for his benefit, although, Petrie did not, in express words, say, that he was going to do so. Petrie denies

making any such an arrangement with Wade or speaking or acting in a way to induce Wade to think that he was going to act for him. He, however, admits that he asked Wade the question, as to what amount Wade would give him to bid the land in and, also, testifies that his purpose was to bid as much as $10,000.00. Wade claims, that relying upon what he understood Petrie had agreed to do, he desisted in his efforts to secure any other purchaser, and did not bid upon the land for himself, and that his friends, who were present, refused to bid, because the land was his home, and that they, as well as himself, believed that Petrie was bidding for the benefit of Wade, and that he did not know until after the sale had been made that Petrie was not going to carry out his agreement with him, but when he asked Petrie upon the subject, Petrie announced to him that he was going to let Morton have the benefit of his bid. Petrie discloses the fact, that while these negotiations were going on between him and Wade, he already had an arrangement with Morton, who was his fellow appraiser of the land, to buy the land in for Morton and to become a surety in the bond and secure other sureties, for which Morton was to pay him the sum of $500.00. Petrie states that the arrangement between him and Morton did not exist until after the sale, but one of two things is very evident, either Petrie made the arrangement with Wade, which Wade claims he did, and, after bidding in the land, refused to carry out the arrangement, because he would rather risk Morton than Wade for the $500.00, which he was trying to make out of the transaction, or else he had already arranged with Morton and then negotiated with Wade to induce him to cease his exertions to have the land bring a higher price, so that he might purchase it for less than $10,000.00, as he did. Anyhow, the land, which was appraised by Morton and Petrie at the sum of $12,150.00, and for which Petrie announced to Wade that he intended to bid $10,000.00, was sold for the sum of $8,300.00, and the situation is presented of the lien creditors failing to receive their debts out of the proceeds to the amount of about $2,000.00, while Petrie, by his manipulations, secures $500.00 out of the transaction. Wade testifies that the lands were worth $15,000.00. Yancey says they were worth $12,000.00, and a witness introduced by the appellant states that they were worth $9,500.00. The lands appraised at $12,150.00 and selling for $8,-300.00 would enable the purchaser to get possession, at

once, upon the confirmation of the sale, and deprive Wade of any redemption right in the lands by a very small margin. Wade had a deep interest in making the lands bring such a sum as would be in the neighborhood of their value, and thereby discharge the debts, which he owed his creditors and in protecting himself to that end.

After the sale had been set aside and the appeal had been prayed from the order by Morton, the judgment was not superseded, and thereafter the commissioner again advertised and sold the land, when one Hall, who was not interested in the litigation nor a party to the litigation in any way, became the purchaser of it at the sum of $9,-501.00. At the second sale, the lands were appraised at $11,950.00. The amount to be raised from a sale of the lands was $9,898.28 and about $150.00 of costs. The second sale was duly reported and confirmed by the court; a deed made to the purchaser and a writ of possession awarded in his favor. To the report of sale nor the confirmation of it, Morton did not in any way object.

It is insisted for the appellee, that the second sale of the lands and its confirmation and the execution of the deed to the purchaser without any objection from appellant, Morton, and Morton having failed to supersede the judgment by which the sale, at which he was the purchaser, was set aside, has the effect of disposing of Morton's rights as the purchaser of the lands at the first sale, and for that reason the appeal should be dismissed. With this view, however, we cannot concur, for while the title of the second purchaser of the lands, he not being a party to the suit nor an attorney in it, is not affected by the result of the appeal from the order setting aside the first sale, the rights of Morton as the purchaser at the first sale are not concluded by a second sale of the lands, if the first sale should turn out to be the one which the court should have confirmed. Runyon v. Bennett, 4 Dana 598; Hayden v. Herbert, Hardin 150; Freeman v. Potter, 1 J. J. M. 193; Bank of Ky. v. VanMeter, 10 B. M. 66; Weber v. Tanner, 23 R. 1107; 1694; Civil Code, sec. 747.

However, for the purposes of this opinion, it will not be necessary to enter into any discussion as to what Morton's rights would be if it should be held that the court below was in error in overruling the motion to confirm the first sale and in ordering it to be set aside, as the conclusion to which we have arrived in regard to the judgment appealed from makes it unnecessary to advert to any further questions in the case.

It is well established, that mere inadequacy in price standing alone is not a sufficient ground for the setting aside of a sale, unless the inadequacy is so great as to create a presumption of fraud or shock the conscience of the court, but when the inadequacy is accompanied by circumstances, which would tend to cause the inadequacy, or where the inadequacy is attended by any apparent unfairness or impropriety or oppression on the part of those connected with the sale, the sale will be set aside, though such circumstances are slight, and, by themselves, do not furnish a sufficient reason for vacating the sale. Byrne v. Henderson, 11 R. 986; Martin v. Zweigart, 24 R. 1920, 72 S. W. 750; Harris v. Gunnell, 10 R. 419; Passmore v. Moore, 15 R. 107; Owens v. Owens, 21 R. 625; Scott v. O'Neil, 23 R. 33; Jolly v. Mutual Life Insr. Co., 23 R. 1508; Booker v. Louisville, 25 R. 497; Stump v. Martin, etc., 9 Bush 285; Rosenbaum v. Pottinger, etc., 22 R. 1290; Bean, etc., v. Hoffendorfer Bros., 84 Ky. 693; Wilson v. Taylor, 4 R. 437; Slaughter's Guardian v. Graham's Ex'tr, 5 R. 324; Terry v. Swinford, 19 R. 712; Booker v. Louisville, 25 R. 497; Busey v. Hardin, 2 B. M. 407; Williams v. Woodruff, 1 Duvall 257; Johnson v. Rowe, 1 R. 274; Youtsey v. Jones, 4 R. 443; Morton v. Morton, 7 R. 752; Adkinson v. Ransdall, 93 Ky. 310; Alms & Doepyke Co. v. Shackelford & Co.'s Ass'ee, 17 R. 908; Shuck v. Price, 22 R. 1261; Egard v. Chearnly, 1 Bush 13; Dale v. Shirley, 5 B. M. 496; and Fisher v. Evans, 175 Ky. 300. In Stump v. Martin, etc., *supra,* it was held that "such (judicial) sales will not be disturbed for mere inadequacy unless there has been such a sacrifice of the property as to import fraud. There must be either fraud or misconduct in some one connected with the sale; some surprise or misapprehension on the part of those interested or of the officer who conducts the sale, or some irregularity in the proceedings, or some other circumstance attending it, which conduces to show unfairness, before the chancellor will refuse to confirm this act of his commissioner." It may be further said, that the confirmation of a judicial sale is a matter in the sound discretion of the trial court upon all the facts and circumstances of the case, and its judgment will not be interfered with, unless it appears that it has abused its discretion. Petrie was connected with the sale as apparently the actual bidder, and, according to his own statement, is interested to the extent of $500.00, which Morton was to pay to him, and which he was endeavoring to get out

of it, and his representations to Wade could have had no other effect than to stop the exertions of Wade to arrange for the purchase of the land by himself or some one else for a sufficiency to pay his creditors, and thus prevent competition in the bidding, which would have otherwise existed. Morton received the benefit of Petrie's manipulations which, if Wade and the circumstances are to be believed, were of such a character as to deceive Wade and prospective bidders for the land, and thereby caused the land to fail to bring, what it should have brought at a fair auction.

It is therefore ordered that the judgment appealed from be affirmed.