FILED
United States Court of Appeals
Tenth Circuit

November 10, 2015

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENH CIRCUIT**

---

SHELTON JACKSON,

     Petitioner - Appellant,

v.

MAURICE WARRIOR, Interim
Warden, Oklahoma State Penitentiary,[*]

     Respondent - Appellee.

No. 13-5119

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA - TULSA
(D.C. No. 08-CV-0204-JHP-FHM)**

---

John T. Carlson, Assistant Federal Public Defender, Denver, Colorado (Virginia L. Grady, Federal Public Defender, Denver, Colorado, Jacob Rasch-Chabot, Research and Writing Specialist, Denver, Colorado, and Mark Henricksen of Henricksen & Henricksen, Lawyers, Inc., Oklahoma City, Oklahoma, with him on the briefs), for Petitioner - Appellant.

Jennifer L. Crabb, Assistant Attorney General, Oklahoma City, Oklahoma (E. Scott Pruitt, Attorney General State Oklahoma, with her on the brief), for Respondent - Appellee.

---

Before **KELLY**, **LUCERO**, and **MORITZ**, Circuit Judges.

---

[*] Pursuant to Fed. R. App. P. 43(c)(2) Anita Trammell is replaced by Maurice Warrior as Interim Warden of the Oklahoma State Penitentiary, effective October 28, 2015.

**KELLY**, Circuit Judge.

Petitioner-Appellant Shelton Jackson appeals from the district court's denial of his petition for writ of habeas corpus challenging his conviction and death sentence. Jackson v. Workman, No. 08–CV–204–JHP–FHM, 2013 WL 4521143 (N.D. Okla. Aug. 26, 2013). In 1997, Mr. Jackson was charged with the murder of Monica Decator in Tulsa, Oklahoma and was subsequently convicted and sentenced to death. Mr. Jackson raises three issues on appeal: (1) whether the state court's submission to the jury of an allegedly invalid sentencing aggravator unconstitutionally skewed the jury's deliberations during the penalty phase of his trial; (2) whether his defense lawyers provided constitutionally deficient representation during the penalty phase; and (3) whether the combined effect of these two errors warrants habeas relief even if, viewed individually, each error is harmless.

We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a), and we affirm.

Background

The Oklahoma Court of Criminal Appeals (OCCA) set forth the relevant facts in its published opinion on direct appeal. Jackson v. State, 146 P.3d 1149,

1154–55 (Okla. Crim. App. 2006). We presume these facts are correct. 28 U.S.C. § 2254(e)(1).

On the morning of April 8, 1997, Mr. Jackson killed his girlfriend Monica Decator, with whom he had been living for several months. The previous day, Mr. Jackson had been watching Ms. Decator's two-year-old son when he "lost his patience" due to the child's fussiness and crying. Jackson, 146 P.3d at 1154. He "picked the child up by the neck, and tossed him to the ground several times." Id. Later, when the child began crying again, Mr. Jackson pushed the child down repeatedly. After this abuse, the child could not walk, and his eyes were "glazy." Id. Mr. Jackson used a screwdriver to pry the child's mouth open because he was having difficulty breathing.

The parties contest the timing and sequence of the next series of events. According to the state, Mr. Jackson covered the severely injured child with a large piece of carpet and hid him in the crawlspace of a nearby vacant house. He then went to a gas station, where he purchased a gallon of gasoline and used an ATM to empty Ms. Decator's bank account. Later that evening, he watched wrestling at his uncle's apartment, as he regularly did. When he returned home, he killed Ms. Decator to prevent her from reporting his child abuse to the authorities. He left town at noon on April 8.

Mr. Jackson provided a different sequence of events to the police. He stated he left the injured child at home in bed when he went to his uncle's house

-3-

to watch wrestling. When Ms. Decator returned to the house that evening, she heard her child crying and discovered his severe injuries. This discovery led to a fight with Mr. Jackson when he returned, which ended when he knocked her unconscious by hitting her in the head several times with a brick. According to Mr. Jackson, at that time he carried the child to the vacant house. When he returned to Ms. Decator, she had regained consciousness, and she attacked him with a knife. He hit her again with the brick, gained control of the knife, and stabbed her.

Ms. Decator's body was discovered at 8:30 a.m. on April 8, when firefighters responded to a fire at her home. Investigators concluded that someone had set the fire intentionally. Police arrested Mr. Jackson later that afternoon, when his Houston-bound bus stopped in McAlester, Oklahoma. He had no visible injuries. In McAlester, Mr. Jackson gave detectives a general location for the hidden child, but they could not find him. Mr. Jackson was then taken to a police station in Tulsa, where he provided more specific directions to find the child and gave a statement confessing to the child abuse and killing of Ms. Decator.

On April 29, 1997, Mr. Jackson was charged with first degree murder, first degree arson, and injury to a minor child. A jury found Mr. Jackson guilty of all three crimes and recommended the death penalty for his murder conviction. On appeal, the OCCA found that Mr. Jackson's trial attorneys were constitutionally

ineffective because they conceded Mr. Jackson's guilt without consulting with him or obtaining his consent or acquiescence. Jackson v. State, 41 P.3d 395, 400–01 (Okla. Crim. App. 2001). The OCCA reversed and remanded Mr. Jackson's murder conviction and death sentence for a new trial, and affirmed his convictions for arson and injury to a child. Id. at 401.

Mr. Jackson's retrial was held in March 2003. At the guilt stage of Mr. Jackson's second trial, the salient question for the jury was whether Mr. Jackson acted with deliberate intent to kill Ms. Decator, or whether instead he acted in self-defense or in the heat of passion. The jury found that Mr. Jackson intended to kill Ms. Decator, and he was again convicted of first degree murder. Okla. Stat. Ann. tit. 21, § 701.7(A) (Supp. 1996).

At the penalty phase of the second trial, the prosecution sought to prove four aggravating circumstances, each listed in Oklahoma's death penalty statute:

(1)     Ms. Decator's murder was especially heinous, atrocious, or cruel ("heinous crime aggravator");

(2)     Mr. Jackson killed Ms. Decator for the purpose of avoiding or preventing a lawful arrest or prosecution for a previous crime—the abuse of her child ("avoid arrest aggravator");

(3)     Mr. Jackson posed a continuing threat to society because he would probably commit violent acts in the future ("continuing threat aggravator"); and

(4)     During the commission of the murder of Ms. Decator, Mr. Jackson knowingly created a great risk of death to more than one person—the injured child ("great risk of death aggravator").

Id. § 701.12; 16 R. 23 (2003 Trial Tr.).[1]

At trial, the state rested upon the evidence presented during the guilt phase of the trial to prove the first three aggravators. The state offered testimony from the doctor who treated the child at the hospital to prove the final aggravator—that Mr. Jackson knowingly created a great risk of death to the child when he murdered Ms. Decator. After the trial judge dismissed the continuing threat aggravator, the jury found the remaining three aggravators applied.

Before the jury's deliberations, Mr. Jackson's defense counsel presented mitigating evidence, much of it focused on Mr. Jackson's life history. Mr. Jackson's mother drank heavily throughout her pregnancy, and a neurologist testified that Mr. Jackson suffered from fetal-alcohol syndrome, causing an array of cognitive and functional disabilities. Mr. Jackson's stepfather abused him severely. His classmates teased him for poor hygiene and a speech impediment, and he was committed to the Louisiana Department of Corrections when he was twelve years old. He spent three difficult years in a correctional facility that the Department of Justice later accused of failing to protect children from abuse.

Mr. Jackson's defense counsel also presented as mitigating evidence the character witness testimony of Arthur Farahkhan. Mr. Farahkhan worked with

---

[1]  In conjunction with the filing of his opening brief, Mr. Jackson submitted to this court a CD containing an electronic version of the record on appeal. We cite directly to this electronic record, and to its various folders and volumes, in accordance with Mr. Jackson's briefing.

-6-

Mr. Jackson developing a program to assist disadvantaged youth. He testified about Mr. Jackson's leadership qualities and his genuine desire to improve life in his neighborhood. He stated that Mr. Jackson's life would have value in prison.

Mr. Farahkhan had provided similar testimony in Mr. Jackson's first trial. There he stated that he "believ[ed] in the death penalty." 11 R. 2189 (1998 Trial Tr.). He reconciled his general belief in the death penalty with his support for Mr. Jackson because he did not think Mr. Jackson's murder of Ms. Decator was premeditated. Id. The first trial judge sustained an objection by the prosecution and admonished the jurors to disregard Mr. Farahkhan's comment regarding premeditation.

Prior to testifying at the second trial, Mr. Farahkhan "made it crystal clear" to Mr. Jackson's counsel that, consistent with his previous testimony, he believed Mr. Jackson would deserve the death penalty if the murder of Ms. Decator was premeditated. 1 R. 219 (Post-Conviction). Despite this warning, Mr. Jackson's counsel called Mr. Farahkhan to testify. When, on cross-examination, Mr. Farahkhan agreed with the prosecution that "the death penalty would be appropriate" if Mr. Jackson "intentionally" killed Ms. Decator, Mr. Jackson's counsel did not object or ask Mr. Farahkhan any further questions. 17 R. 129–30 (2003 Trial Tr.).

Mr. Jackson filed a direct appeal from the conviction and death sentence resulting from his second trial. He raised ten propositions of error, including that

-7-

there was insufficient evidence to prove beyond a reasonable doubt the great risk of death aggravator. The OCCA affirmed the murder conviction and death sentence. Jackson, 146 P.3d at 1168. Mr. Jackson then sought post-conviction relief, raising seven propositions of error. Among other things, he argued that his trial counsel was ineffective in investigating and presenting Mr. Farahkhan as a mitigation witness and in failing to object to his testimony during cross-examination. Mr. Jackson also argued that his appellate counsel was ineffective for failing to raise that claim on direct appeal. 1 R. 274, 276 (Post-Conviction). The OCCA denied all requested relief in an unpublished opinion, 1 R. 273 (Post-Conviction) (PCD 2003-670), and the United States Supreme Court denied Mr. Jackson's petition for a writ of certiorari, Jackson v. Oklahoma, 552 U.S. 838 (2007).

Mr. Jackson initiated this federal habeas action pursuant to 28 U.S.C. § 2254 in October 2008. He again argued the evidence was insufficient to prove beyond a reasonable doubt the great risk of death aggravator and that both his trial and appellate counsel were constitutionally ineffective. The federal district court denied the petition but granted a COA on Mr. Jackson's ineffective assistance claim. Jackson, 2013 WL 4521143, at *45. We expanded the COA to include Mr. Jackson's improper aggravator claim.

## Discussion

The standard of review applicable to Mr. Jackson's claims depends on whether and how the state court resolved those claims. Alverson v. Workman, 595 F.3d 1142, 1146 (10th Cir. 2010). When a state court has adjudicated a claim on the merits, a petitioner may obtain federal habeas relief only if the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2). Federal law is "clearly established" when it is embodied in a holding of the Supreme Court. Carey v. Musladin, 549 U.S. 70, 74 (2006); Williams v. Taylor, 529 U.S. 362, 412 (2000).

Our review under § 2254(d) is "highly deferential" and requires us to give "state-court decisions . . . the benefit of the doubt." Littlejohn v. Trammell, 704 F.3d 817, 824 (10th Cir. 2013) (quoting Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam)). When we review a state court's application of federal law, "we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly. Rather, we must be convinced that the application was also objectively unreasonable." McLuckie v. Abbott, 337 F.3d 1193, 1197 (10th Cir. 2003) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)).

I.      The Submission to the Jury of the Great Risk of Death Aggravator

        A.      The Alleged Invalidity of the Great Risk of Death Aggravator

Mr. Jackson's first argument is that the trial court's submission to the jury of the great risk of death aggravator unconstitutionally skewed its deliberations during the penalty phase of his second trial. Under Oklahoma law, the great risk of death aggravator focuses on whether "another person was endangered by the defendant's actions in killing the victim." Hanson v. State, 206 P.3d 1020, 1033 (Okla. Crim. App. 2009). The aggravator is "established by acts which create a great risk of death to another person in close proximity to the homicidal act in terms of time, location, and intent." Harris v. State, 84 P.3d 731, 751 (Okla. Crim. App. 2004). "The gravamen of the circumstance is not the number of persons killed, but the callous creation of the risk to more than one person." Williams v. State, 22 P.3d 702, 724 (Okla. Crim. App. 2001).

Mr. Jackson strenuously objected to the prosecution's submission of the great risk of death aggravator to the jury. He contended that Oklahoma law requires juries applying the great risk of death aggravator to focus on the risk to another person created by the homicidal act itself. Yet, here, the child's injuries were far removed in time, place, and intent from the murder of Ms. Decator. According to Mr. Jackson, the child was not present in the house when he killed Ms. Decator; he had been hidden in another location roughly twelve hours earlier. See Hanson, 206 P.3d at 1033 (requiring evidence that another person was "so

-10-

near the victim at the time of the murder and consequently put in jeopardy of suffering real harm"); Miller v. State, 313 P.3d 934, 988 (Okla. Crim. App. 2013) (applying the great risk of death aggravator only "where the homicidal act at issue puts another person at great risk of death, because of that other person's 'close proximity' to the victim at the time of the homicidal act"); Salazar v. State, 919 P.2d 1120, 1123 (Okla. Crim. App. 1996) ("In the majority of the cases in which this aggravator has been upheld, the endangered bystanders who suffered a great risk of death were either in the line of the defendant's fire or were contemporaneously injured or killed by the defendant."); but see Ryder v. State, 83 P.3d 856, 874 (Okla. Crim. App. 2004) (holding that a defendant who killed a woman, waited for her son to return home, and then killed her son had created a great risk of death to more than one person; although not simultaneous, the two murders were "in close proximity").

To the contrary, the state argued at trial and on appeal that the aggravator was appropriate because Mr. Jackson acted with a single "murderous intent" when he hid the severely injured child where authorities were unlikely to find him and then murdered his mother to prevent her from reporting the abuse. Jackson, 146 P.3d at 1163. Ms. Decator's murder created a great risk of death to the child because, as his mother, she was the only person likely to search for and find him before he died from his injuries. Id.

-11-

The trial court agreed with the state, viewing the incidents with Ms. Decator and her child as part of a single continuing transaction warranting application of the aggravator. On direct appeal after the second trial, the OCCA did not directly address the merits of Mr. Jackson's or the state's arguments when it affirmed his conviction and sentence. The OCCA noted that "[t]he circumstances here are unlike those in any of our prior cases and the opposing parties at oral argument each made persuasive arguments in support of their position." Id. at 1164. Regardless, the court continued, "[w]e need not decide the issue" because, even if Mr. Jackson's conduct did not constitute the knowing creation of a great risk of death to more than one person, "the submission of this aggravator to the jury did not skew the jury's decision to impose the death penalty." Id.

The OCCA based this analysis on Brown v. Sanders, 546 U.S. 212 (2006), which "set forth a test to determine when a death sentence must be set aside if an aggravating circumstance is invalidated." Jackson, 146 P.3d at 1164. Under Sanders, "[a]n invalidated sentencing factor . . . will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." Id. (quoting Sanders, 546 U.S. at 220). Therefore, the OCCA explained, a sentence will stand if "the jury could have properly considered the evidence used

-12-

to support the invalidated aggravator anyway because it also supported a separate and valid aggravator." Id. Because the evidence presented to support the allegedly invalid great risk of death aggravator was also "relevant to support the aggravator that he committed the murder of Decator 'to avoid arrest or prosecution,'" the jury's deliberations were not unconstitutionally skewed. Id.

### B. The Applicability of *Sanders* in Oklahoma

Given the procedural posture of Mr. Jackson's claim and the OCCA's decision, we need not determine whether the great risk of death aggravator was indeed appropriate under these facts. We must determine only whether the OCCA's decision to affirm Mr. Jackson's death sentence was an unreasonable application of Sanders. Mr. Jackson contends the OCCA's decision was "contrary to clearly established federal law" because Sanders, upon which it relied, does not apply in Oklahoma. Application of a "rule different from the governing law set forth in [Supreme Court] cases" is a clear violation of § 2254(d)(1). Bell v. Cone, 535 U.S. 685, 694 (2002).[2]

---

[2] The state asserts Mr. Jackson waived his argument about the applicability of Sanders in Oklahoma by failing to raise it below. In his briefing, Mr. Jackson acknowledges he "cannot quarrel with the thrust of the State's assertion: his theory as to *why he satisfies the § 2254(d) standard* is new." Aplt. Rep. Br. 11. Although we generally decline to address theories a party did not develop before the district court, United States v. Windrix, 405 F.3d 1146, 1156 (10th Cir. 2005), Mr. Jackson has argued vigorously at every stage of this litigation that the submission of the great risk of death aggravator to the jury violated his constitutional rights. His position on appeal that the OCCA misapplied Sanders is

-13-

As described in Sanders, Supreme Court precedent historically has distinguished between "weighing" and "non-weighing" death penalty jurisdictions. 546 U.S. at 216. Generally, in order to impose the death penalty in a weighing jurisdiction such as Oklahoma, Duckett v. Mullin, 306 F.3d 982, 1001 n.9 (10th Cir. 2002), a sentencer must first find a defendant guilty of capital murder and determine that at least one statutory factor rendering a defendant eligible for a death sentence applies. Then, to decide whether a "death-eligible" defendant will in fact receive the death penalty, the sentencer must weigh any mitigating evidence against the statutorily-defined factors that rendered the defendant death-eligible in the initial eligibility stage. Sanders, 546 U.S. at 217; Stringer v. Black, 503 U.S. 222, 229 (1992).

In weighing states, "[s]ince the eligibility factors by definition identified distinct and particular aggravating features, if one of them was invalid the jury could not consider the facts and circumstances relevant to that factor as aggravating in some other capacity." Sanders, 546 U.S. at 217. Thus, the sentencer's consideration of an invalid eligibility factor "necessarily skewed its balancing of aggravators with mitigators" and therefore required automatic reversal of the sentence, "unless a state appellate court determined the error was

_____

closely intertwined with his prior position and involves pure matters of law appropriate for our review under these circumstances.

-14-

harmless or reweighed the mitigating evidence against the valid aggravating factors." Id.

In a nonweighing state—just as in a weighing state—a sentencer must limit its initial consideration of whether a defendant is death-eligible to factors expressly described in the applicable statute. However, once the sentencer has reached the secondary deliberation stage, it may consider aggravating factors beyond those enumerated eligibility factors to determine whether to impose a death sentence. In this way, the sentencer in a nonweighing state is allowed broader discretion to consider aggravating and mitigating circumstances at the secondary stage. Because of this broader discretion, the "automatic skewing" problems arising in weighing states do not necessarily follow from the introduction of an invalid eligibility factor in nonweighing states. For example, death penalty deliberations are not necessarily skewed when the aggravating factors are entirely different from the eligibility factors, or when the aggravating factors add to the eligibility factors categories that would allow the same facts and circumstances to be weighed in aggravation under a different rubric. Id. Thus, determining whether the submission of an invalid factor amounted to constitutional error in nonweighing states historically required a more complex analysis than the weighing-state "automatic skewing" rule provided.

The Supreme Court in Sanders noted that "[t]his weighing/non-weighing scheme is accurate as far as it goes, but it now seems to us needlessly complex

-15-

and incapable of providing for the full range of possible variations." Id. at 219.

For example, the same concerns giving rise to the automatic skewing rule in weighing states would arise if a sentencing factor, rather than an eligibility factor, was later found to be invalid. In such a case, the weighing process would be automatically skewed for the same reason: "The sentencer might have given weight to a statutorily or constitutionally invalid aggravator." Id. at 219–20. Yet, in some cases the "automatic skewing" could be "shown to be illusory for the same reason that separates weighing States from non-weighing States: One of the other aggravating factors . . . made it entirely proper for the jury to consider as aggravating the facts and circumstances underlying the invalidated factor." Id. at 220.

> For these reasons, the Supreme Court stated:
>
> We think it will clarify the analysis, and simplify the sentence-invalidating factors we have hitherto applied to non-weighing States, if we are henceforth guided by the following rule: An invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process unless one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances."

Id. at 220 (citation and footnote omitted).

Here, Mr. Jackson argues the new rule announced in Sanders expressly applies only in nonweighing states; in weighing states, including Oklahoma, the automatic skewing rule remains good law. Thus, submission to the jury of an

invalid aggravator is per se constitutional error. Mr. Jackson primarily highlights

the court's emphasis on its intent to "simplify the sentence-invalidating factors

we have hitherto applied to *non-weighing States*." Id. (emphasis added). Yet,

given the whole of the Court's discussion, we do not believe this phrasing

restricts the scope of the streamlined rule to nonweighing jurisdictions.

Indeed, it is evident from the structure of the opinion that the Court

intended to eliminate the outmoded weighing-nonweighing dichotomy in its

entirety. By choosing first to elaborate, at great length, on the many problems

arising from the "needlessly complex" distinction, the Court signaled its intent to

eliminate that distinction.[3] Then, after setting forth the new rule, the Court

applied it to the case at hand, explaining it was "leaving aside the

weighing/non-weighing dichotomy and proceeding to the more direct analysis set

forth earlier in this opinion: All of the aggravating facts and circumstances that

the invalidated factor permitted the jury to consider were also open to their proper

consideration under one of the other factors." Id. at 222–23. Thus, no

constitutional violation had occurred because the invalid factor could not have

"skewed" the sentence. Id. at 223. The dissenting Justices interpreted this

---

[3] Among other problems the Court highlighted, determining in the first instance whether a state employs a weighing or nonweighing scheme can be difficult given the myriad complexities of state death penalty statutes. Cf. id. at 219 n.5; id. at 234–35 (Breyer, J., dissenting). In fact, the majority in Sanders believed California to be a nonweighing state, while Justice Stevens in dissent believed it to be a weighing state. Id. at 222.

language to "modify our settled law," id. at 228, and wholly "abolish (or at least diminish the importance of)" the outmoded dichotomy, id. at 239.

Accordingly, we recently applied the Sanders framework to an Oklahoma sentence, although the petitioner did not make the argument that Sanders applies only in nonweighing states, an argument we now reject. Hanson v. Sherrod, 797 F.3d 810, 848-50 (10th Cir. 2015). Several other circuits have likewise applied a uniform Sanders rule. Sutton v. Bell, 645 F.3d 752, 759 (6th Cir. 2011) (applying Sanders to a death sentence in Tennessee, a weighing state); Jennings v. McDonough, 490 F.3d 1230, 1255 n.22 (11th Cir. 2007) ("[I]t is probable that the Court's decision in [Sanders] announced a uniform rule to be applied in weighing and nonweighing states alike."); Rousan v. Roper, 436 F.3d 951, 963 (8th Cir. 2006) (apparently interpreting Sanders as applying one rule to weighing and nonweighing states); see also 1 Wayne R. LaFave, Substantive Criminal Law § 3.5, at 16, n.112 (2d ed. Supp. 2007) ("While an approach different from that in Zant was once used in so-called 'weighing statutes,' the Court later, in Brown v. Sanders, adopted a single rule for all statutes . . . ."); The Supreme Court, 2005 Term—Leading Cases, 120 Harv. L. Rev. 134, 144 (2006) ("The new Sanders rule clarifies and provides predictability to the weighing-nonweighing distinction by jettisoning it in favor of a simplified rule."); but see Wilson v. Mitchell, 498 F.3d 491, 507 (6th Cir. 2007) ("This rule apparently modifies the analysis for

non-weighing States, but leaves intact the Court's prior jurisprudence regarding weighing states.").[4]

Thus, we hold that Sanders established a uniform rule applying in both weighing and nonweighing states. Therefore, the OCCA looked to the proper "clearly established" federal law when it relied on Sanders to affirm Mr. Jackson's sentence.

C.    The Distinction Between Admissibility and "Aggravatability"

Mr. Jackson next argues that, even if Sanders is applicable in Oklahoma, the OCCA nevertheless misinterpreted the Supreme Court's guidance by conflating the question whether evidence is admissible with whether a jury may properly consider evidence as giving aggravating weight to a valid sentencing factor.

As discussed in detail above, the Court in Sanders held that an invalidated sentencing factor will not render a death sentence unconstitutional if one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances. Responding to concerns raised by the dissent, the

_____

[4] Mr. Jackson cites two unpublished Tenth Circuit orders, both preceding Hanson, in which our language suggested Sanders may apply only in nonweighing states. Dunlap v. Clements, 476 F. App'x 162, 171 (10th Cir. 2012) (unpublished); Ochoa v. Workman, 451 F. App'x 718 (10th Cir. 2011) (unpublished). However, in neither of these orders did we directly address the scope and applicability of Sanders, and, regardless, unpublished orders lack precedential value. Fed. R. App. P. 32.1(A).

majority in <u>Sanders</u> explained that this rule is not "an inquiry based solely on the *admissibility* of the underlying evidence."  546 U.S. at 220 (emphasis added).  If the presence of an invalidated sentencing factor allowed the jury to hear and consider evidence that would not have been before it otherwise, "due process would mandate reversal without regard to the rule we apply here."  <u>Id.</u> at 221. Instead, the Court's central concern in <u>Sanders</u> was "the jury's *weighing* in favor of death a factor that should not have been part of its calculus."  <u>Id.</u> at 221 n.7 (emphasis added).

According to Mr. Jackson, the OCCA ignored this guidance and confused admissibility and aggravating weight by holding that, "[i]f the jury could have properly *considered the evidence* used to support the invalidated aggravator anyway because it also supported a separate and valid aggravator . . . the jury has not *considered any improper evidence* and has not weighed any improper aggravating evidence against the mitigating evidence in arriving at its sentence." <u>Jackson</u>, 146 P.3d at 1164 (emphasis added).  The OCCA further explained that, here, "the 'great risk of death' aggravator was not supported by any evidence that was not also *admissible* to support a separate aggravator."  <u>Id.</u> (emphasis added). Mr. Jackson contends this language underscores the OCCA's improper focus on the admissibility of the evidence—which, as the Supreme Court noted in <u>Sanders,</u> raises separate due process concerns—rather than the aggravating weight of that evidence.

Mr. Jackson argues the OCCA failed to appreciate that, "[w]hile all valid aggravating evidence is admissible, not all admissible evidence is aggravating." Aplt. Br. 48. Even if evidence of the child's injuries "*in and of themselves*" was admissible, these injuries "could not properly be given aggravating weight" under the valid avoid arrest aggravator. Id. at 49. Instead, the child's injuries would be admissible only for the limited purpose of proving Mr. Jackson's motive for killing Ms. Decator, to avoid arrest or prosecution for child abuse. Ultimately, only this motive is important, and thus only Mr. Jackson's awareness of the nature and extent of the child's injuries should receive aggravating weight. Id. at 49–50.

Although the OCCA's use of the phrases "consider any improper evidence" and "admissible to support a separate aggravator" may be imprecise, Mr. Jackson overemphasizes the import and effect of any imprecision. It is clear from the OCCA's analysis that it appreciated the proper boundary between the general admissibility of evidence at trial and the use of evidence to give aggravating weight to a valid sentencing factor. In accord with Sanders, the core of its opinion is that there was no constitutional error because the facts and circumstances the jury considered as aggravating under the allegedly invalid great risk of death factor—the nature and extent of the child's injuries—could be given aggravating weight under the valid avoid arrest factor.

Further, consideration of the injuries in and of themselves surely informs Mr. Jackson's awareness of those injuries and his related motive. The more severe the nature and extent of the injuries, the more likely Mr. Jackson was to be aware of them and concerned about possible arrest and prosecution.

Additionally, as the state points out, a sentencing jury does not weigh evidence independently during its deliberations. Instead, the jury considers the evidence presented to determine if the state has proven the required elements of an aggravating circumstance beyond a reasonable doubt. If the aggravating circumstance has been proven, the jury then weighs that circumstance—not the underlying evidence itself—against any mitigating circumstances. See Vernon's Okla. Forms 2d, OUJI-CR 4-80 ("If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, the death penalty shall not be imposed unless you also unanimously find that any such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances."). Thus, if evidence may be considered to help a jury decide if an aggravating circumstance applies, as the OCCA determined was proper here, that evidence has been given appropriate aggravating weight.

For these reasons, the OCCA's application of Sanders, finding the physician's testimony could properly be considered to support the valid avoid arrest factor, was not objectively unreasonable. McLuckie, 337 F.3d at 1197.

D.    The Treating Physician's Testimony

-22-

Mr. Jackson next argues that the OCCA misapplied <u>Sanders</u> because "the doctor's testimony would not have been admissible to prove the avoid-arrest factor. And if it would not have been admissible to prove the avoid-arrest factor, of course, neither could it have carried aggravating weight under that factor." Aplt. Br. 56. We disagree. During the guilt phase, the court shielded the jury from most evidence about the nature and extent of the child's injuries. The trial judge allowed the prosecutors to characterize the child's injuries as "serious" but "prohibit[ed] the state from going into any detail as to any injuries suffered" by the child. 9 R. 3–4 (2003 Trial Tr.).

Mr. Jackson agrees that some facts concerning the child's injuries were properly before the jury because they suggested he murdered Ms. Decator to avoid arrest for child abuse. However, he argues the admitted facts should have been "limited to what Jackson himself saw and knew about the child's condition." Aplt. Br. 59. The OCCA erred, he contends, because the doctor's testimony did not speak to what Mr. Jackson appreciated about the injuries "so much as what highly skilled trauma surgeons equipped with sophisticated brain-imaging devices could appreciate." Aplt. Rep. Br. 32. Essentially, he argues only the facts contained in his own statement to the police soon after his arrest were admissible. At that time, Mr. Jackson told the detectives that the child's body was "cramming up," that his eyes "had this glaze upon 'em, you know, like wasn't nothing there,"

and that he "knew something was very wrong." State's Ex. 54. By contrast, the doctor's testimony, involving a substantially more detailed and clinical account of the child's injuries and subsequent treatment, "revealed nothing about what Jackson actually knew of the injuries." Aplt. Br. 60.

As Mr. Jackson notes, the OCCA disagreed that the physician's testimony lent no support to the valid avoid arrest aggravator. Id. at 52. It held that the doctor's testimony "showed that Jackson appreciated the seriousness of the child's condition and deliberately murdered the child's mother to avoid being held responsible." Jackson, 146 P.3d at 1164. We conclude that fair-minded jurists could agree. The more severe the nature of the child's injuries, as perhaps only a physician can fully and accurately describe, the more likely Mr. Jackson was aware of the gravity of his crime and concerned about the ramifications.

We cannot find this determination to be unreasonable under our deferential standard, and Mr. Jackson has not demonstrated that he is entitled to relief under § 2254(d)(1).[5]

II.    Ineffective Assistance of Counsel Concerning Mr. Farahkhan's Testimony

        A.    Mr. Farahkhan's Character Witness Testimony

Mr. Jackson's next argument is that his lawyers made a critical error during his sentencing proceedings by allowing Mr. Farahkhan to "testify that Jackson

_____

[5] As such, we need not address Mr. Jackson's remaining arguments regarding the proper procedure for harmless-error analysis.

deserved the death penalty." Aplt. Br. 71–72. Mr. Jackson argues this error rendered his assistance constitutionally ineffective under the Sixth Amendment.

As discussed above, Mr. Jackson's lawyers asked Mr. Farahkhan to testify as a character witness in support of Mr. Jackson's case in mitigation during the penalty phase of both his first and second trials. Prior to the second trial, Mr. Farahkhan met with Mr. Jackson's lawyers and expressed concerns that his views on the death penalty might pose a problem. He advised them that he "believe[d] in the death penalty under some circumstances, including premeditated murder and in cases of ambush." 1 R. 219 (Post-Conviction). Mr. Farahkhan did not believe Mr. Jackson had committed premeditated murder, but he informed them that, "if this case was a case of premeditated murder and if Mr. Jackson was waiting to kill Ms. Decatur [sic] because of what he did . . . then he would deserve the death penalty." Id.

On direct examination during the second trial, Mr. Farahkhan testified that Mr. Jackson volunteered in a community-based drug-abuse program, which served a highly distressed area of north Tulsa. 17 R. 124–26 (2003 Trial Tr.). According to Mr. Farahkhan, Mr. Jackson "really wanted to see those people in Comanche who had alcohol, drug, gang problems, to be able to overcome those problems." Id. at 126. Mr. Farahkhan testified that Mr. Jackson's life in prison would have value because of his leadership qualities and genuine desire to improve the lives of others. Id. at 127–28.

-25-

The following exchange occurred during Mr. Farahkhan's cross-examination:

> Prosecutor: Did you know or do you know that [Mr. Jackson] intentionally bludgeoned his girlfriend, Monica Decator, with a brick at least seven times on the head, then stabbed her in the neck at least eight times cutting her jugular, her common carotid artery, then stuck a knife two times right by her heart? Did you know he did that?
>
> Mr. Farahkhan: I listened closely to the language you used, and you said intentionally. Did I know that he intentionally did that?
>
> Prosecutor: Yes.
>
> Mr. Farahkhan: No, I did not know that he intentionally did that.
>
> Prosecutor: Does that change your opinion any?
>
> Mr. Farahkhan: If I accept what you said, that he intentionally did it, it would change my opinion. But I don't believe that he intentionally did it.
>
> Prosecutor: If you believe that he intentionally did it, do you think the death penalty would be appropriate?
>
> Mr. Farahkhan: Yes.

Id. at 129–30. Mr. Jackson's counsel did not object during this exchange or ask Mr. Farahkhan any further questions.

B.     The Doubly-Deferential *Strickland* Standard Under AEDPA

In his state post-conviction petition, Mr. Jackson argued his trial lawyers were constitutionally ineffective for, among other things: (1) calling Mr. Farahkhan to testify in the first instance, despite knowing Mr. Farahkhan

-26-

approved of the death penalty in instances of premeditated murder; and (2) failing to object during Mr. Farahkhan's damaging cross-examination.

The OCCA first held that their "strategy in calling Farahkhan as a witness in Jackson's capital sentencing proceeding was neither unreasonable nor unsound" under Strickland v. Washington, 466 U.S. 668 (1984). 1 R. 277 (Post-Conviction). Furthermore, the fact that his lawyers did not object during Mr. Farahkhan's cross-examination did not render counsel constitutionally ineffective. Although the government's hypothetical question—whether Mr. Farahkhan's opinion would change if he knew Mr. Jackson killed Ms. Decator intentionally— was improper, the OCCA denied relief. 1 R. 278 (Post-Conviction). The court emphasized that Mr. Farahkhan presented ample relevant mitigating evidence for the jury to consider, and any error on the part of either the prosecution or defense was harmless. "[T]he jury . . . was not misled by this exchange because it was evident that Farahkhan was not advocating the death penalty for his friend. . . . [W]e do not find that his testimony on cross-examination either erased the benefits of his testimony on direct examination or affected the outcome of the second stage of this trial." Id. at 278.

Here, Mr. Jackson acknowledges that "his lawyers' threshold decision to call Farahkhan as a witness was not in itself an objectively unreasonable strategy." Aplt. Br. 78. Mr. Farahkhan provided mitigating evidence about positive aspects of Mr. Jackson's character. However, Mr. Jackson argues his

-27-

lawyers' silence following the prosecutor's questions on cross-examination rendered their assistance constitutionally ineffective. Further, they failed to file a motion in limine prior to Mr. Farahkhan's testimony to limit the scope of cross-examination, did not ask the judge to instruct the jury to disregard the damaging testimony, and declined to conduct a rehabilitative re-direct examination of Mr. Farahkhan. Id. at 82–83. Their inaction, Mr. Jackson argues, violated his Sixth Amendment rights.

Generally, to prevail on an ineffective assistance of counsel claim under Strickland, a petitioner must show: (1) his lawyers' performance was deficient such that they effectively failed to function as the "counsel" guaranteed to all criminal defendants by the Sixth Amendment, and (2) their deficient performance so prejudiced the defense that the defendant was deprived of a fair trial. 466 U.S. at 687. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" Wiggins v. Smith, 539 U.S. 510, 521 (2003) (quoting Strickland, 466 U.S. at 688). We "must indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. An ineffective assistance claim may be rejected based upon an inadequate showing of deficient performance or prejudice, or both. Id. at 697.

-28-

Moreover, where a state court has adjudicated an ineffective assistance of counsel claim on the merits, as the OCCA did here, a petition for habeas relief cannot be granted unless the state adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Given that the standards of review under both Strickland and AEDPA are "highly deferential," habeas review of ineffective assistance claims is "doubly so." Harrington v. Richter, 562 U.S. 86, 105 (2011). We defer both to counsel's strategic decisions about how best to represent his client and to the state court's determination that counsel's performance was not deficient. See Yarborough v. Gentry, 540 U.S. 1, 5–6 (2003) (per curiam). We grant relief only where a state court disposition "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103; see also Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) ("The question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

C.     The OCCA's *Strickland* Analysis

Mr. Jackson has not met his substantial burden of showing the OCCA lacked any justification for denying his ineffective assistance claim, that the applicability of a Supreme Court holding was so obvious there could be "no fairminded disagreement." White v. Woodall, 134 S. Ct. 1697, 1706 (2014). Even assuming his lawyers' inaction after Mr. Farahkhan's testimony constituted deficient performance, Mr. Jackson has not shown the OCCA was unreasonable in its determination that there was no prejudice. To establish prejudice, Mr. Jackson must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Wiggins, 539 U.S. at 534. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." Id. The prejudice prong is satisfied if at least one juror would have struck a different balance. Id. at 537.

Before Mr. Farahkhan's testimony, the jury heard substantial evidence of a heinous crime in graphic detail. They heard about how Mr. Jackson brutally beat a two-year-old child and, to avoid being held responsible, placed the injured child underneath a vacant house in near-freezing temperatures. He murdered his girlfriend by hitting her repeatedly in the face and head with a brick and stabbing her multiple times in the neck and chest, and he set fire to her house. On the

-30-

other hand, the jury also heard mitigation evidence about Mr. Jackson's difficult childhood and about the physical and mental limitations he faced due to his mother's alcohol abuse during pregnancy. Given this ample evidence, both weighing for and against the death penalty, the OCCA properly concluded there was no reasonable probability that, absent Mr. Farahkhan's single damaging statement, the jury's deliberations would have been different.

For these reasons, the OCCA reasonably rejected Mr. Jackson's ineffective assistance of counsel claim.

III.    Cumulative Error

Mr. Jackson's final argument on appeal is that the aggregate impact of errors in his case cannot be excused. Aplt. Br. 94. Under cumulative error review, a court "merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." Hamilton v. Mullin, 436 F.3d 1181, 1196 (10th Cir. 2006) (citing Workman v. Mullin, 342 F.3d 1100, 1116 (10th Cir. 2003)). Mr. Jackson argues that the "submission of the invalid sentencing factor inflated the aggravation side of the scale, while the failure to object to Farahkhan's testimony weakened the mitigation calculus." Aplt. Br. 95. As we have noted, "cumulative-error in the federal habeas context applies only where there are two or more actual constitutional errors." Thacker v. Workman, 678

-31-

F.3d 820, 849 (10th Cir. 2012).  That is not the case here and Mr. Jackson's

cumulative error is unavailing.

AFFIRMED.[6]

---

[6] We deny Mr. Jackson's renewed request for a certificate of appealability
(COA) on the issue of whether a jury must be instructed that it must find
aggravating circumstances outweigh the mitigating circumstances beyond a
reasonable doubt.  Circuit precedent forecloses this claim.  See Matthews v.
Workman, 577 F.3d 1175, 1195 (10th Cir. 2009).